UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA ex rel. NAJMUDDIN
PERVEZ,

                        Plaintiff,

            -against-                                        01 Civ. 2745 (LAK)


BETH ISRAEL MEDICAL CENTER and
ERNST & YOUNG, LLP,

                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


                    **MEMORANDUM OPINION**


            Appearances:

                        Rebecca C. Martin
                        Assistant United States Attorney
                        PREET BHARARA
                        UNITED STATES ATTORNEY
                        *Attorneys for Plaintiff-Intervenor United States of America*

                        Philip R. Michael
                        MICHAEL LAW GROUP, P.C.
                        *Attorneys for Plaintiff-Relator*

                        Richard A. Cirillo
                        Anne M. Cook
                        KING & SPALDING LLP
                        *Attorneys for Defendant Ernst & Young, LLP*


LEWIS A. KAPLAN, *District Judge.*

            Relator Najmuddin Pervez, a former executive at Beth Israel Medical Center

("BIMC") from 1973 to 1991, brings this *qui tam* action on behalf of the United States of America,

2

the State of New York, and himself against BIMC and Ernst & Young ("E&Y"), an accounting and consulting firm retained by BIMC to audit certain of its financial statements and Medicaid cost reports. The government intervened to assert and then settled the claims of the United States against BIMC. It declined to take over the claims against E&Y. Accordingly, Pervez pursues those claims.

Pervez asserts that E&Y violated various provisions of the federal and New York False Claims Acts (the "FCA" and the "NY FCA," respectively)[1] by causing false claims and statements to be made and presented in connection with the preparation and submission of Medicaid cost reports (also known as Institutional Cost Reports, or "ICRs") for the Petrie campus ("Petrie"), of BIMC for the years 1991 through 2003. The matter is before the Court on E&Y's motion to dismiss the third amended complaint for failure to state a legally sufficient claim. For the reasons set forth below, the motion is granted.

*Facts*

Notwithstanding the parties' voluminous submissions, the allegations at base are relatively simple. Pervez claims that BIMC fraudulently reported certain financial information to the New York state Medicaid agency from 1991 to 2003 in order to receive reimbursements to which it was not entitled. He asserts that E&Y knowingly assisted BIMC in this alleged fraud by falsely certifying that E&Y had audited BIMC's fraudulent cost reports and by falsely representing in its accompanying opinion letters that it believed the information to be "free of material misstatements" and "fairly presented in all material respects."[2]

---

[1]    31 U.S.C. §§ 3729 *et seq.*; N.Y. STATE FIN. L. §§ 187 *et seq.*

[2]    Third Amended Complaint ("Cpt.") ¶ 58.

*Medicaid*

Medicaid provides medical insurance for low income individuals and families.  It is funded jointly by the federal and state governments and is supervised by the United States Department of Health and Human Services through the Centers for Medicare and Medicaid Services ("CMS").  It is administered, however, by the states.  In New York City, the program is managed primarily by the New York State Department of Health ("DoH") and is subject to regulations and guidelines governing the process by which providers seek reimbursement for their Medicaid expenses.  The federal government pays 50 percent of Medicaid costs, and the State and City share the remaining 50 percent.[3]

Each participating hospital is required to submit an ICR to DoH at the end of the fiscal year.[4]  Among other things, the hospital must allocate the hospital's expenses among "cost centers."  Under NY Medicaid law, some costs – those related to administering the Medicaid program – are reimbursable and are properly allocated to reimbursable cost centers.  Other costs deemed unrelated to Medicaid services – including capital costs incurred by a provider to support the space and operations of physicians' private practices – are not reimbursable and must be allocated to nonreimbursable cost centers.[5]

These cost reports are prepared by the provider, which must certify that the information contained therein is true, correct, and complete and prepared in accordance with

---

[3]      *Id.* ¶¶ 8-11.

[4]      *Id.* ¶ 13.

[5]      *Id.* ¶¶ 14-16, 48.

applicable instructions.[6]   In addition, Section § 86-4.4 of the pertinent regulations[7] mandates that "[a]ll financial and statistical reports . . . be certified by an independent licensed public accountant or an independent certified public accountant on forms prescribed and provided by the Department."[8]  The reports, including the certifications, then are submitted to the DoH.

Pervez alleges in a conclusory fashion that DoH uses these ICRs to estimate current-year Medicaid entitlements, allowing hospitals to receive funds on an interim basis throughout the year.[9]  He later explains that, under NY State Medicaid law, "capital costs" are reimbursed in accordance with their "actual" costs and that wrongly allocating capital costs to reimbursable cost centers in a cost report necessarily results in the state and federal government overreimbursing the provider.  The State of New York as *amicus curiae* describes the process in similar terms, explaining that "a hospital's 'capital costs' . . . are reimbursed on an annual basis using the actual costs reported

---

[6]

*See* Cook Decl., May 26, 2010 [DI 86], Ex. B (2000 New York State Medicaid Institutional Cost Report filed for the Petrie division of BIMC with the DoH) (hereinafter "2000 Petrie ICR"), at 4 (provider certification certifying that the signer has examined the information contained in the ICR and that "to the best of my knowledge and belief, it is a true, correct, and complete statement prepared from the books and records of the provider in accordance with applicable instructions . . . .").

Notwithstanding certain mischaracterizations to the contrary, *see, e.g.*, Cpt. ¶¶ 44-45, 51 (stating that E&Y "prepared" the cost reports), the complaint and documents incorporated therein clearly state that providers, not auditors, "prepare" the cost reports.  Outside auditors and CPAs like E&Y merely audit and certify those reports.  *See, e.g., id.* ¶ 53 ("While the first page of the cost reports state that they were prepared by a Petrie 'Corporate V.P. of Financial Planning,' the actual audit, certification and opinion of the cost reports and its related Exhibits were to be done by E&Y.").

[7]

10 N.Y. COMP. CODES R. & REGS. § 86-4.4.

[8]

Cpt. ¶ 43.

[9]

*Id.* ¶ 13.

in each year's ICR; if the information contained in an ICR is not accurate, a hospital will not receive the proper reimbursement for its capital costs. . . . DOH uses the ICR to calculate a hospital's capital cost reimbursement."[10]  New York State then seeks reimbursement from the federal government of half of the actual cost of the reimbursement paid to the provider.

*BIMC's Petrie Medicaid Cost Reports*

BIMC is a not-for-profit corporation, owned by parent company Continuum Health Partners, that operates a teaching hospital and other health care facilities in New York City, including the Petrie campus, the Phillips Ambulatory Care Center, and, before it was sold, Beth Israel-North (formerly Doctors Hospital).[11]  Petrie has contractual arrangements, known collectively as the "faculty practice plan" ("FPP"), with more than 500 physician-employees pursuant to which the physicians are required, *inter alia*, to engage in professional private practices at Petrie-supplied offices.  Petrie does the billing for the participating physicians and benefits from the substantial resulting revenue.[12]   As these private practices are not eligible for Medicaid reimbursement, however, the capital costs associated with those practices also are not reimbursable.

Pervez alleges that Petrie's ICRs for the years 1991 through 2003 fraudulently misrepresented information regarding capital costs associated with the FPP.[13]  The factual details

---

[10] NY Mem. [DI 81] at 4.

[11] Cpt. ¶ 2.

[12] *Id.* ¶¶ 22-29.

[13] *E.g.*, *id.* ¶ 48 ("During the years 1991 through 2003, in direct violation of the Medicaid reimbursement rules, Petrie knowingly included costs for capital expenditures incurred in

6

alleged to show the falsehoods contained in the Petrie ICRs – *e.g.*, specifically which care facility and service costs were accounted for inaccurately and how those inaccuracies appeared in different portions of the cost reports and exhibits[14] – are complicated.  The gist, however, is not.  Pervez claims that Petrie's ICRs failed to allocate a variety of non-reimbursable FPP capital costs to non-reimbursable cost centers in the Petrie ICRs and that they failed in 2002 and 2003 to allocate the correct amounts of non-reimbursable FPP capital costs to non-reimbursable cost centers in the reports.[15]  BIMC and E&Y allegedly became aware in 2002 of a government investigation regarding BIMC's Medicare and Medicaid reporting and, as a result, the 2002 and 2003 ICRs for the first time correctly assigned some but not all of the non-reimbursable FPP capital costs to non-reimbursable cost centers.[16]

Pervez alleges, without explaining precisely how this came to pass,[17] that submitting these false ICRs "caus[ed] Medicaid damages to the United States and the State of New York of approximately $60 million."

---

[14]     support of its FPP physicians' private practices in its Medicaid Cost Reports by including such costs in its . . . reimbursable cost centers rather than, as required, in non-reimbursable cost centers.").

Pervez describes in significant detail how the reports falsely allocated to reimbursable cost centers in the Petrie ICRs non-reimbursable capital costs associated with, *inter alia*, 23 off-premises Methadone Maintenance Treatment Program clinics, *see id.* ¶¶ 32-37, drug detoxification services, *see id.* ¶¶ 38-41, and the Phillips Ambulatory Care Center, *see id.* ¶ 30.

[15]     *Id.* ¶ 29.

[16]     *Id.* ¶ 56.

[17]     *Id.* ¶ 67.

*E&Y's Audits, Certifications, and Opinion Letters*

Around 1982, BIMC retained E&Y to serve as its outside auditor with respect to the ICRs for its Petrie campus.[18]  E&Y audited, certified, and provided an opinion letter for each of Petrie's allegedly false ICRs from 1991 to 2003.  Each letter stated, *inter alia,* that:

> "We conducted our audit in accordance with generally accepted auditing standards.  These standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatements.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements.  An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.  We believe that our audit provides a reasonable basis for our opinion."[19]

Each letter stated also that "these [audited] financial statements are the responsibility of the facility's management.  Our responsibility is to express an opinion on these financial statements based on our audit."[20]  Each letter then certified that, in light of its audit, E&Y believed that the financial information contained in the reports and the exhibits that were audited was "fairly presented in all material respects" and was "in conformity in all material respects" with the applicable DoH computer-form instructions.[21]

Pervez claims that E&Y, contrary to the statements contained in these certifications

---

[18]   *Id.* ¶ 7.

[19]   *Id.* ¶ 17; *see also* 2000 Petrie ICR, at 3.

[20]   2000 Petrie ICR, at 3.

[21]   Cpt. ¶¶ 63, 65.

8

and opinion letters,  in fact did not perform the audits it claimed to have performed.[22]  Moreover, he asserts that E&Y knew that the Petrie cost reports and exhibits falsely allocated FPP capital costs to reimbursable cost centers and that BIMC falsified the Petrie cost reports and exhibits for the purpose of defrauding the state and federal Medicaid programs.[23]

*Prior Proceedings*

Pervez brought this *qui tam* action in 2001 against BIMC, alleging substantially the same theory of fraud now before the Court.  E&Y subsequently was added as a co-defendant in an amended complaint.

On November 30, 2005, the government partially intervened in the case with respect

---

[22]

*See, e.g.*, *id.* ¶ 52 ("E&Y was not truthful when it certified that it had done audits."); *id.* ¶ 53 ("E&Y falsely certified that such tests [required as part of the audit] had been prepared."); *id.* ¶ 54 ("E&Y intentionally certified that it had audited – when it had not done so – non-reimbursable capital expenses and statistical information found on Petrie's Medicaid Cost reports and related exhibits."); *id.* ¶ 58 ("But, E&Y skipped over [Exhibit 19], did not do the 'testing' that it has promised it had done, and certified to and, in essence, avoided Exhibit 19 altogether.  E&Y certified Exhibit 19 despite the absence of any capital costs from the nonreimbursable cost centers."); *id.* ¶ 62 ("E&Y sought to deceive DOH  into believing that it had done the requisite reconciliations.").

On at least three occasions, the complaint asserts that if E&Y actually had carried out the required audits, the falsity of various aspects of the Petrie cost reports and exhibits necessarily would have been revealed both to E&Y and to the DOH.  *See, e.g.*, *id.* ¶ 37 ("If E&Y had carried out the required audit, certification and opinion responsibilities, the falsity of Petrie's Methadone cost reporting would have been revealed (and, presumably, corrected) . . . ."); *id.* ¶ 41 ("[A]n actual and truthfully completed audit of Medicaid Cost Report Exhibits 28 and 40 by E&Y would have disclosed to E&Y, as well as DOH, that Petrie was claiming an exorbitant amount in capital reimbursement from Medicaid related to drug detoxification services."); *id.* ¶ 56 ("If E&Y had 'audited' Petrie's Exhibit 19 statistics as it had represented, that would have led to a reliable quantification of FPP's capital costs."). *See also id.* ¶ 52 (asserting that having recklessly performed the audits, as opposed to not having performed them at all, would make the certification equally false).

[23]

*See, e.g.*, *id.* ¶¶ 78-79; *id.* ¶ 81("E&Y fully participated in, and helped to orchestrate, BIMC's deceptive practices concerning BIMC's Medicaid Cost reports . . . .").

to BIMC and settled the claims against that defendant,[24] leaving only the claims against E&Y.  More than three years later, the government declined to intervene as to those claims.[25]  Pervez now pursues the claims against E&Y.

The third amended complaint alleges multiple causes of action under the federal and New York False Claims Acts.  Pervez asserts liability for (1) presenting false claims to the government under FCA Section 3729(a)(1); (2) making false records or statements under Section 3729(a)(2); (3) reverse false claims under Section 3729(a)(7); and (4) conspiracy to defraud the government via false claims under Sections 3729(a)(3) and 3732(b).  He asserts the same claims under the comparable provisions of the New York False Claims Act.

E&Y challenges the sufficiency of these claims on multiple grounds.  In addition to other arguments particular to each specific statutory provision, E&Y argues with respect to all of the claims that (1) the ICRs are not "claims" within the meaning of the FCA,[26] (2) the complaint does not allege a false statement by E&Y, and (3) the complaint fails to plead fraud with particularity as required by Rule 9(b).

*Discussion*

*The Motion to Dismiss Standard*

In deciding a motion to dismiss, a court must accept as true all well pleaded facts

---

[24]

*See, e.g.,* DI 27.

[25]

DI 57.

[26]

Both the United States and the State of New York submitted *amicus curiae* briefs contesting this assertion.  *See* DI 81, 82.

alleged in the complaint and draw all reasonable inferences in the plaintiff's favor.[27]  At the same time, "'[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to [defeat] a motion to dismiss.'"[28]  A court must apply a "plausibility standard": while "not akin to a 'probability requirement' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully."[29]  The plaintiff must plead "factual allegations sufficient 'to raise a right to relief above the speculative level.'"[30]  Such motions are addressed to the face of the pleadings, but a court may consider also documents attached to the complaint as exhibits or incorporated into it by reference.[31]

Because "[i]t is self-evident that the FCA is an anti-fraud statute . . . claims brought under the FCA fall [also] within the express scope of Rule 9(b)."[32]  In addition to the normal pleading requirements, Rule 9(b) requires that a plaintiff alleging fraud "state with particularity the

---

[27]

See Levy v. Southbrook Int'l Invs., Ltd., 263 F.3d 10, 14 (2d Cir. 2001).

[28]

Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 337 (2d Cir. 2006).

[29]

Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).

[30]

Boykin v. KeyCorp, 521 F.3d 202, 213 (2d Cir. 2008) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)); see also Wood ex. rel. United States v. Applied Research Assocs., Inc., 328 Fed. Appx. 744, 747 (2d Cir. 2009) ("The two working principles underlying this standard are: (1) the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions; and (2) only a complaint that states a plausible claim for relief survives a motion to dismiss, and where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not show[n] – that the pleader is entitled to relief." (internal quotation marks omitted) (quoting Iqbal, 129 S. Ct. at 1949-50)).

[31]

Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000).

[32]

Gold v. Morrison-Knudsen Co., 68 F.3d 1475, 1476-77 (2d Cir. 1995).

circumstances constituting fraud."[33]  "Malice, intent, knowledge, and other conditions of a person's mind may be averred generally."[34]   Nonetheless, "[w]hile Rule 9(b) permits scienter to be demonstrated by inference, this must not be mistaken for license to base claims of fraud on speculation and conclusory allegations.  An ample factual basis must be supplied to support the charges."[35]

## I.   The Federal False Claims Act

### A.   Sections 3729(a)(1) and 3729(a)(1)(B)

The FCA imposes civil liability on any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval."[36]  To state a claim under this section, Pervez must allege that (1) there was a false or fraudulent claim (2) E&Y knew it was false or fraudulent, (3) E&Y presented the claim, or caused it to be presented, to the United States, and (4) it did so to seek payment from the federal treasury.[37]

---

[33]

FED. R. CIV. P. 9(b).

[34]

*Id.*

[35]

*O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991) (internal quotation marks and citation omitted).

[36]

31 U.S.C. § 3729(a)(1) (2006), *amended by* Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. No. 111-21, 123 Stat. 1617 (2009).  Although Section 3729(a)(1), (a)(3) and (a)(7) were amended by FERA, those amendments were prospective only.  The prior provisions govern claims in this action under those sections.

[37]

*See United States ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 113 (2d Cir. 2010).

Section 3729(a)(1)(B) imposes liability also where a person "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."[38] Under this provision, Pervez must allege that: (1) E&Y made, or caused BIMC to make, a false or fraudulent record or statement (2) E&Y knew it to be false or fraudulent, and (3) it was material to a claim.

As is apparent, some of the elements are common to both causes of action.  In each case, there must have been a "claim."  Either the claim itself, under subsection (a)(1), or a record or statement material to a claim, under subsection (a)(1)(B), must have been false or fraudulent. And the defendant must have known that the claim or statement was false or fraudulent.

1.      *False Claims and/or Statements*

The FCA defines a "claim" as "a request or demand for money or property . . . that

---

[38]    31 U.S.C. § 3729(a)(1)(B).

Prior to FERA, Section 3729 (a)(2) established liability where a person "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."

Section 4(f)(1) of FERA provided that the changes to 31 U.S.C. § 3729(a)(2) "shall take effect as if enacted on June 7, 2008, and apply to all claims under the False Claim Act that are pending on or after that date."  Concerned about the constitutional implications of applying this amendment retroactively, some courts have interpreted "claims" in this context as referring to claims for payment filed with the government rather than legal claims filed with courts.  *See, e.g.*, *United States ex rel. Sanders v. Allison Engine Co., Inc.*, 667 F. Supp. 2d 747 (S.D. Ohio 2009).  The Second Circuit, however, has assumed in at least one case, without significant discussion, that the amendment applies retroactively to all legal claims pending before a court on or after June 7, 2008.  *U.S. ex. rel. Kirk*, 601 F.3d at 113.  Accordingly, this Court assumes that the amended § 3729(a)(1)(B) governs Pervez's claims under § 3729(a)(2).  The Court notes, however, that the outcome would be the same under either the amended or the unamended version of that provision because the knowledge element – with respect to which the Court finds Pervez's pleadings insufficient – is common to both the old and the new provisions.

is presented to an officer, employee, or agent of the United States; or is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government provides or has provided any portion of the money or property requested or demanded; or will reimburse such contractor . . . for any portion of the money . . . requested . . . ."[39]

The FCA does not define falsity.  Courts, however, have identified three distinct types of claims as actionable on such a basis.  "In some cases, a claim made to the government is 'factually false,' meaning that a contractor supplies 'an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided' – in other words, the contractor bills for something it did not provide. . . . More difficult to assess, however, are cases in which a contractor falsely represents that it is in compliance with a particular federal statute or regulation."[40]  An "express [and therefore actionable] false certification" occurs where a claim "falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment."[41]  Even where no express certification is required, however, there may still be liability on an "implied certification theory." An implied false certification "takes place where a statute expressly conditions payment on compliance with a given statute or regulation, and the contractor, while failing to comply with the statute or regulation (and

---

[39]

31 U.S.C. § 3729(b)(2).

[40]

*Kirk*, 601 F.3d at 113-14; *see also Mikes v. Straus*, 274 F.3d 687, 696-700 (2d Cir. 1991) (explaining and adopting "legally false" certification theory).

[41]

*Mikes*, 274 F.3d at 698.

while knowing that compliance is required), submits a claim for payment."[42]

E&Y argues first that the Petrie ICRs did not constitute "claims" because no reimbursements flowed directly from them.  Even if they were claims, E&Y argues, Pervez has not made a sufficient showing that either the ICRs or E&Y's certifications and opinion letters were false or fraudulent.

Pervez sufficiently has pleaded falsity with respect to the Petrie ICRs.  Taking as true the extensive pleadings regarding (1) the New York Medicaid regulations governing presentation of financial data, particularly with respect to non-reimbursable capital costs, and (2) BIMC's seeming failure to account properly for a variety of non-reimbursable FPP capital costs in its Petrie ICRs, Pervez plausibly has alleged that the ICRs were both factually false and false as well on an express certification theory.  He has identified several specific types of capital costs associated with Petrie's FPP that allegedly were reported inaccurately as reimbursable in the cost reports and exhibits.  Pervez has pleaded sufficient factual details to make plausible his allegations that the Petrie ICRs falsely allocated FPP capital costs to reimbursable rather than non-reimbursable cost centers.            The same cannot be said for Pervez's allegations regarding the alleged falsity of E&Y's certifications and opinion letters.  First, Pervez has alleged no facts from which the Court reasonably might infer that E&Y did not perform the audits it claimed to have performed, or did not perform them in compliance with professional standards, as it certified to the DoH.  He does not identify any auditing procedures that should have been but were not employed by E&Y.  Instead, the complaint repeatedly makes the bald assertion that E&Y must not have performed the audits in conformity with its professional obligations and standard auditing procedures as claimed because

---

[42] *Kirk*, 601 F.3d at 115.

it would have identified various misrepresentations contained in the ICRs if it had done so.[43]  Pervez has not, however, identified any factual support for this theory that would raise it from merely consistent with the other allegations to plausible.[44]  He does not point to any facts indicating that an audit performed in conformity with professional guidelines necessarily would have uncovered the falsehoods allegedly contained in Petrie's ICRs.  Nor does he allege any statements or documentary evidence that might indicate that the audit was not performed or that it was performed other than in conformity with E&Y's professional obligations.  In fact, he alleges nothing at all with respect to how E&Y did or did not perform the audits, except to make the bare assertion that the results in and of themselves show that E&Y must not have done so.  He has not satisfied the requirements of Rule 9(b) in this respect.

The complaint is insufficient also with respect to the alleged factual falsity of E&Y's opinion letter.  On its face, each opinion letter offered only a professional opinion, informed by E&Y's audit, that the financial information contained in the Petrie ICRs and related audited exhibits, was "fairly presented in all material respects in relation to the basic financial statements taken as a whole and is in conformity in all material respects with the applicable instructions provided with the

---

[43]

See supra note 22.

[44]

See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) ("The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (citations and internal quotation marks omitted)); Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007) ("[A] complaint must allege facts that are not merely consistent with the conclusion that the defendant violated the law, but which actively and plausibly suggest that conclusion.").

EICR software . . . relating to the preparation of the cost report."[45]  Pervez has stated no facts tending to show that this actually was not E&Y's professional opinion with regards to the information contained in the Petrie ICRs.  He makes only the conclusory assertion that it must not have been E&Y's true opinion because E&Y knew that it had not done the audits and/or knew that BIMC had falsified the Petrie ICRs.  This bare accusation alone is insufficiently particular to allege falsity.  Without more, it does not support a reasonable inference that the opinion letters were factually false with respect to the opinions they expressed.

For essentially the same reasons, Pervez has not pleaded adequately that the opinion letters were false on either an express or an implied certification theory.   The letters did not attest to the Petrie ICRs' regulatory compliance as Pervez claims.  They certified only that E&Y believed the statements and related audited information to be fairly presented in all material respects and in conformity with the EICR software's instructions.[46]  And while Pervez has identified numerous New York rules and regulations governing the preparation of ICRs, he has not alleged any manner in

---

[45]    2000 Petrie ICR, at 3 (E&Y's certification, titled "Annual Report of Hospitals and Hospital Healthcare Complexes Report of Independent Certified Public Accountant").

[46]    An engagement letter between E&Y and BIMC dated September 25, 2001, explicitly disclaimed any obligation to test for fraud or to certify either regulatory compliance or the absolute accuracy of the information:

> "As you are aware, there are inherent limitations in the audit process, including for example, selective testing and the possibility that collusion or forgery may preclude the detection of material errors, fraud, and illegal acts.  Accordingly, a material misstatement may remain undetected. . . . [A]n audit conducted in accordance with auditing standards generally accepted in the United States does not include procedures specifically designed to detect illegal acts having an indirect effect . . . on the financial statements.  Our procedures do not include testing compliance with laws and regulations in any jurisdiction (including, but not limited to, those related to the Medicare and Medicaid antifraud and abuse statutes)."  Cirillo Decl., Feb. 5, 2010 [DI 75], Ex. B, at 2.

which E&Y – as an auditor auditing the cost reports, not a provider preparing and submitting them – failed to conform its professional conduct to a rule, regulation, or statute governing audits.

Accordingly, Pervez has not adequately pleaded that E&Y's certifications and opinion letters were false statements or records.  But the Court does not rest on this conclusion alone.

2.      Scienter

To survive E&Y's motion to dismiss with respect to any of the FCA claims, Pervez must sufficiently allege E&Y's "knowledge" that the claim and/or statement at issue was false.  For purposes of claims under the FCA, a person acts knowingly when he "has actual knowledge of the information; acts in deliberate ignorance of the truth or falsity of the information; or acts in reckless disregard of the truth or falsity of the information."[47]  "No proof of specific intent to defraud" is required.[48]

Pervez seems to assert in the alternative that E&Y (1) actually knew that the Petrie ICRs incorrectly claimed FPP capital costs as reimbursable, and (2) recklessly disregarded the ICRs' falsity either by not performing the audits claimed or by performing them in a manner E&Y knew to be inadequate or incomplete.

Pervez has not pleaded any facts tending to make Pervez's allegations of actual knowledge plausible.  As previously discussed, Pervez does not allege any facts supporting his assertion that E&Y did not perform the audits as claimed.  He does not identify any auditing

---

[47]      31 U.S.C. § 3729(b).

[48]      *Id.*

procedures that E&Y should have employed but did not employ.  Nor does he provide any reason

for inferring that E&Y deliberately chose not to perform the audits as certified or to perform them

inadequately.  Pervez merely makes the sweeping and, so far as the complaint discloses, entirely

unfounded assertion that E&Y either must have intentionally assisted BIMC in its fraudulent

concealment or it must not have done the audits as claimed because if it had done the audits it

necessarily would have detected the falsity of the ICRs.[49]  He does not, however, point to any facts

indicating how or why an audit performed in conformity with professional guidelines necessarily

would have uncovered the falsehoods allegedly contained in Petries' ICRs.  Hence, the facts alleged

in the complaint simply do not make out a plausible allegation of knowledge on any theory – actual,

reckless, or deliberate ignorance.

This failure is especially glaring in the unusual context of FCA claims brought

against a secondary actor – an outside auditor – rather than the provider that actually submitted the

allegedly false claims.  Section 3729(a)(1)(B) does provide a cause of action in such circumstances,

but it seems particularly important here, where the allegedly culpable conduct at issue is at a

somewhat greater remove, that the complaint describe adequately a plausible basis for attributing

knowledge or deliberate ignorance to the party facing secondary liability.  This complaint does not

do so.[50]

---

[49]

      *See supra* note 22; Reply Br. 26 ("It is inconceivable that this FPP world was overlooked by both E&Y and Petrie without an agreement between them.").

[50]

      At least one district court in a similar context came to the same conclusion even before *Twombly*'s higher pleading standard.  *See United States ex rel. Grynberg v. Ernst & Young LLP, et al.*, 323 F. Supp. 2d 1152 (D. Wy. 2004) ("While Relator stresses that no proof of specific intent to defraud is required under the FCA, his allegations of the required scienter [with respect to defendant auditors] are bare conclusions without any factual support.").

* * *

No reasonable interpretation of the complaint makes Pervez's claim that E&Y knew of the allegedfalsity of the Petrie ICRs on any cognizable theory.  The first and second causes of action must be dismissed.[51]

B.   *Section 3729(a)(3) and Section 3729(a)(7)*

Pervez claims damages also under Section 3729(a)(3) for conspiracy[52] and under Section 3729(a)(7) for a "reverse false claim."[53]

Pervez has made only conclusory allegations with regards to the claimed conspiracy,[54] failing to plead any facts making plausible an unlawful agreement between the

---

[51]

The Court doubts that Pervez adequately has pleaded that E&Y "caused" the allegedly false Petrie ICRs to be presented to the government as required by § 3729(a)(1).  Where, as here, the defendant itself had no direct interest in seeing the allegedly false claims paid, it is at least debatable whether the defendant fairly may be characterized as having caused the request for payment.  The Court need not decide this issue, however, in light of its holding with respect to *scienter.*

[52]

The old Section 3729(a)(3) provides liability for defendants who "conspire[] to defraud the Government by getting a false or fraudulent claim allowed or paid."  31 U.S.C. § 3729(a)(3).

[53]

The former Section 3729(a)(7), recodified after Pervez filed this action as Section 3729(a)(1)(G), imposes liability on a defendant who "knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729 (a)(7).

[54]

The only paragraph in the complaint that alleges an unlawful agreement states that "[t]hrough the acts described above and otherwise, [E&Y] entered into one or more conspiracies to defraud the United States and the New York State Medicaid program through the submission of false and fraudulent claims and through the payment received by Defendant on these false and fraudulent claims.  Defendant has also conspired to omit disclosing or to actively conceal facts which, if known, would have reduced government obligations to BIMC.  Defendant has taken substantial overt steps in furtherance of those

parties.[55]  Moreover, because Pervez has failed adequately to allege E&Y's knowledge of the falsity

of the false claims and statements at issue, he fails also to make out either a conspiracy or a reverse

false claim.  Accordingly, the third and fourth causes of actions are dismissed.

## II.    The New York False Claims Act

Pervez asserts essentially the same claims under the NY FCA as well.  E&Y argues

that these claims fail (1) because the NY FCA does not apply retroactively and (2) on the merits.

The NY FCA, enacted on April 1, 2007, is closely modeled on the federal FCA[56] and

provides for liability with respect to any person who, *inter alia*, (1) knowingly presents a false or

fraudulent claim to the State or a local government for payment, (2) knowingly makes a false

statement to get a false claim paid, (3) conspires to defraud the state or local government by getting

a false claim paid, or (4) knowingly makes or causes to be made a reverse false claim.[57]  Even

assuming that the NY FCA applies retroactively – a question this Court need not and does not decide

---

conspiracies including, among other acts, preparing false cost reports and other records and submitting such reports and records to the State of New York for payment or approval." Cpt. ¶ 78.

[55]

*Accord United States ex rel. Capella v. Norden Systems, Inc.*, No. 94 Civ. 2063, 2000 WL 1336487 (D. Conn. Aug. 24, 2000) ("The complaint merely alludes to an agreement between Defendants and does not specify the particulars of how and when that alleged conspiracy arose, who entered into, or what act was committed in furtherance of the conspiracy. . . . Consequently, Relator's fifth claim alleging an FCA § 3729(a)(3) conspiracy is dismissed . . . .").

[56]

Pervez acknowledges that "New York State's FCA mirrors the Federal Claims Act . . . in most material respects."  Opp. Br. 29.

[57]

N. Y. State Fin. L. § 189.  The relevant subsections of § 189 are nearly identical to the federal FCA provisions discussed above: N.Y. State Fin. Law § 189(1)(a) mirrors 31 U.S.C. § 3729(a)(1); § 189(1)(b) mirrors the old 31 U.S.C. § 3729(a)(2); § 189(1)(c) mirrors 31 U.S.C. § 3729(a)(3); and § 189(1)(g) mirrors 31 U.S.C. § 3729(a)(7).

21

– Pervez's claims under the NY FCA fail for the same reasons as his claims under the federal FCA.


*Conclusion*

For the foregoing reasons, the defendant's motion to dismiss [DI 73] is granted.  In light of Pervez's previous opportunities to amend the pleadings, the Clerk shall enter final judgment of dismissal with prejudice.

SO ORDERED.

Dated:          September 13, 2010

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)